UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL DOCKET |
| VERSUS | NO. 12-291 |
| DAVID RAINEY | SECTION "N" (3) |

## <u>ORDER AND REASONS</u>

Before the Court are the following motions:   (1) <u>Pretrial Motion No. 1</u>:
Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Lack of a
Congressional Committee Inquiry or Investigation (Rec. Doc. 39); (2) <u>Pretrial Motion No. 2</u>:
Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Failure to Allege
Knowledge of a Pending Congressional Investigation (Rec. Doc. 41); (3) <u>Pretrial Motion No. 3</u>:
Defendant David Rainey's Motion to Dismiss Count One of the Indictment Because Section
1505 Does Not Apply to Subcommittee Investigations (Rec. Doc. 43); (4) <u>Pretrial Motion No. 4</u>:
Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Unconstitutional
Vagueness (Rec. Doc. 45);  (5) <u>Pretrial Motion No. 5</u>:  Defendant David Rainey's Motion to
Exclude the August 2, 2010 Flow-Rate Estimates and the Report of the Flow Rate Technical
Group (Rec. Doc. 53); (6) <u>Pretrial Motion No. 6</u>:  Defendant David Rainey's Motion for a Bill of
Particulars (Rec. Doc. 47); and (7) <u>Pretrial Motion No. 7</u>:   Defendant David Rainey's Motion to
Strike Surplusage (Rec. Doc. 49).

# I. **BACKGROUND**:

This case arises out of alleged exchanges between the United States government and an employee of a BP plc ("BP") subsidiary, during and following the *Deepwater Horizon* oil spill.[1] At the time of the spill, defendant David Rainey worked as a vice president of exploration for a BP subsidiary. After the blowout on the *Deepwater Horizon*, Rainey was made Deputy Incident Commander with Unified Command, which was made up of representatives from BP, the United States government, and others.

On November 14, 2012, the grand jury returned a two-count indictment against Rainey. Count One alleges obstruction of a congressional inquiry and investigation in violation of 18 U.S.C. § 1505. Specifically, Count One charges that between approximately May 4, 2010 and May 24, 2013, Rainey "did corruptly endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation of was being had by a Committee of the United States of Representatives, to wit: the Subcommittee on Energy and Environment of the Committee on Energy and Commerce" ("the Subcommittee"). Rec. Doc. 1 at ¶ 28.

---

[1] A general summary of the oil spill incident can be found at *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 2013 WL 144042 *1 (E.D. La. Jan. 11, 2013) (Barbier, J.):

> On April 20, 2010, a loss of well control and one or more fires and explosions occurred on the *Deepwater Horizon*, which had been engaged in drilling activities in Mississippi Canyon Block 252 — the location known as "Macondo" — on the Outer Continental Shelf off the coast of Louisiana. The *Deepwater Horizon* sank to the ocean floor two days later. As a result of these events, oil began to discharge into the Gulf of Mexico. The flow of oil continued for three months before the well was capped on July 15, 2010. The MC252 Well was finally sealed with the completion of a relief well on September 19, 2010.

In earlier paragraphs, the indictment alleges that Rainey was involved in two specific interactions with Congress. First, the indictment alleges that Rainey failed to disclose certain information concerning flow-rate estimation during a May 4, 2010 briefing of members and staff of Congress. Rec. Doc. 1 at ¶ 23. Second, the indictment alleges Rainey prepared a response to a May 14, 2010 letter from the chairman of the Subcommittee, which response BP then submitted to the Subcommittee on May 24, 2010. *Id.* at ¶¶ 23-26. The indictment alleges that the BP response was false and misleading and concealed information regarding flow-rate estimates and other estimations directed at quantifying the volume of the oil spill. *Id.* at ¶ 26.

Count Two charges Rainey with making false statements to law enforcement in violation of 18 U.S.C. § 1001(a)(2). Specifically, Count Two alleges that during an April 8, 2011 interview with law enforcement agents, Rainey falsely stated that he had calculated a flow-rate estimate to be approximately 5,000 barrels of oil per day ("BOPD") before seeing a flow-rate estimate by the National Oceanic and Atmospheric Administration ("NOAA") of 5,000 BOPD, but that in fact he had prepared his estimate only after seeing NOAA's estimate. *Id.* at ¶ 30.

The defendant now moves: (1) to dismiss Count One of the indictment on four separate grounds (Pretrial Motions Nos. 1 through 4) (Rec. Docs. 39, 41, 43 and 45); (2) to strike certain sentences from paragraph 20 of the indictment (describing flow rate estimates made months after the alleged criminal conduct) (Pretrial Motion No. 5) (Rec. Doc. 53); (3) for a bill of particulars (Pretrial Motion No. 6) (Rec. Doc. 47); and (4) to strike certain surplusage from the indictment as irrelevant and unduly prejudicial.

## II. LAW AND ANALYSIS:

**A.** ***Pretrial Motion No. 1***:   **Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Lack of a Congressional Committee Inquiry or Investigation (Rec. Doc. 39):**

The defendant first argues that Count One should be dismissed because none of the congressional requests or proceedings alleged in the indictment — neither the May 4, 2010 briefing nor the May 14 letter from the chairman of the Subcommittee — constitutes an inquiry or investigation of a "committee" within the meaning of section 1505.

### 1.   The Statutory Text:

The defendant argues that the plain language of the statute, case law, and policy considerations all support the conclusion that section 1505 applies only to a duly authorized inquiry or investigation by a "committee" or House of Congress and does not reach requests for information issued by individual members of Congress.  The relevant portion of Section 1505 provides:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress...[s]hall be fined under this title, imprisoned not more than 5 years or...both.

18 U.S.C. § 1505.  With impertinent language removed, the statute provides:

> Whoever corruptly...influences, obstructs, or impedes or endeavors to influence, obstruct, or impede...**the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by** either House, or **any committee of either House** or any joint committee of the Congress...[s]hall be fined under this title, imprisoned not more than 5 years or...both.

*Id.* (emphasis added). Relying on the highlighted language, the defendant makes a convincing case that section 1505 applies only to a "due and proper" inquiry of a "committee" (or a "House" or "joint committee")[2] of Congress. In other words, to satisfy the statute, an inquiry must be: (1) had by "a committee of either House...of the Congress" <u>and</u> (2) must be had under "the due and proper exercise of the power of inquiry" of such committee. 18 U.S.C. § 1505.

The defendant also cites to case law supporting this interpretation.[3] For the most part, the government does not disagree that the statute imposes these requirements, although the parties disagree as to whether a formal authorization or resolution is necessary in order for a committee's exercise of its "power of inquiry" to be "due and proper."

     **2.**     **Do Any of the Requests or Proceedings Referenced in the Indictment Constitute an "Inquiry or Investigation" within the <u>Scope of Section 1505?</u>**

The defendant argues that the indictment in this case fails to allege a due and proper investigation or inquiry within the scope of section 1505 because the requests and proceedings referenced in the indictment (1) were not issued by any "committee of either House" and (2) were not issued pursuant to "the due and proper exercise of the power of inquiry" of any such committee. 18 U.S.C. § 1505.

---

    [2] Because the indictment does not charge Rainey with obstruction of an inquiry by a "House" or "joint committee" of Congress, the Court will not continue to repeat these terms.

    [3] *See U.S. v. Mitchell*, 877 F.2d 294, 300 (4th Cir. 1989) (an investigation is protected by § 1505 if it is "a legitimate exercise of investigative authority by a congressional committee in an area within the committee's purview").

## a.  Not the Action of a "Committee":

Specifically, regarding the May 14, 2010 letter referenced in the indictment, the defendant argues that the letter does not constitute an inquiry or investigation under section 1505 because the letter was written by Representative Edward Markey in his capacity as an individual Member of Congress, not as part of any duly authorized committee investigation.   In support of this argument, the defendant raises several points of fact:  (1) unlike letters issued by the Committee on Energy and Commerce ("the Committee") and its Subcommittee on Oversight and Investigations[4] ("the Committee investigation") and later Committee communications joined by Representative Markey in his capacity as chairman of the Subcommittee,[5] the May 14 letter[6] does not expressly reference any committee investigation; (2) unlike letters issued in connection with the Committee investigation and later communications joined by Representative Markey in his capacity as chairman of the Subcommittee, the May 14 letter is written in the first person singular ("I am concerned...," "I would therefore ask...") rather than the third person and first person plural, specifically identifying the committee seeking the information requested ("The Committee on Energy and Commerce is investigating the April 20, 2010 explosion....  To assist the Committee in its ongoing investigation, we request that you respond..."); (3) unlike letters issued in connection with the Committee investigation and later communications joined by Representative Markey in his capacity as chairman of the Subcommittee, the May 14 letter references Representative Markey's own personal concerns ("I am concerned...," "I would

[4]  Rec. Docs. 39-2, 39-3 and 39-4.

[5]  Rec. Docs. 39-6 and 39-7.

[6]  Rec. Doc. 39-5.

therefore ask...") rather than the subject matter of any committee investigation; (4) unlike letters issued in connection with the Committee investigation, the May 14 letter requests that information be provided to Representative Markey's own staff rather than to committee staff or subcommittee staff; and (5) the website of the Energy and Commerce Committee does not include the May 14 letter in its record of Committee and Subcommittee requests for information in connection with its investigation into the *Deepwater Horizon* oil spill, while Representative Markey's individual website does include the May 14 letter as part of his own investigation into the matter.

Regarding the May 4 briefing, alleged in paragraph 23 of the indictment, the defendant points out the indictment does not even allege that the briefing was part of any investigation by the Subcommittee or any other "committee of either House." The defendant also submits evidence indicating that this "briefing" was in fact an informal teleconference to provide information to members of two different subcommittees "just so members who are very interested in the spill can have the basic facts about what is happening regarding the incident." Rec. Doc. 39-10.

The government has presented no factual arguments at all regarding the May 4 briefing.[7] Regarding the May 14 letter, the government simply points to the fact that Representative Markey included in his signature block his title as chairman of the Subcommittee and copied the Committee chairman and ranking members of the Committee and Subcommittee. Moreover, the

-----

[7] Indeed, even after oral argument and substantial briefing, it remains unclear to the Court whether it is the government's position that the May 4 briefing constitutes part of the wrongful conduct charged in Count One or whether it is merely background or surplusage.

government has presented no countervailing evidence (although counsel for the government did represent to the Court at oral argument that the government has unspecified evidence showing that the Subcommittee was in fact holding hearings or meetings right before the May 14 letter was sent).[8]   Instead, the government rests primarily on the argument that the Court is limited at this stage of the proceeding to determining the sufficiency of the indictment and may not decide preliminary factual issues or consider evidence in making this determination.

### b.  Not Pursuant to the "Due and Proper Exercise" of Congress' "Power of Inquiry":

The indictment alleges that following the blowout, "the Subcommittee commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well."  Rec. Doc. 1 at ¶ 22.   The indictment also alleges that Rainey "did corruptly endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation of was being had by a Committee of the United States of Representatives, to wit:  the Subcommittee on Energy and Environment of the Committee on Energy and Commerce" ("the Subcommittee").  Rec. Doc. 1 at ¶ 28.   The government argues that these allegations are sufficient to allege that an "inquiry or investigation" was being had by the Subcommittee as required to state an offense under section 1505.   In addition to arguing that the congressional actions alleged in the indictment are not the actions of a "committee" within the meaning of section 1505 (but rather are the actions of an individual member), as discussed above, the defendant argues that the indictment is deficient because it fails to allege specific facts

---

[8] Such facts are not mentioned in the indictment and apparently have not been shared with the defense.

that would support the conclusion that the inquiry or investigation was duly authorized, *i.e.,* that it was being had under "the due and proper exercise" of the committee's "power of inquiry." In other words, the defendant in essence complains that the indictment fails to allege facts demonstrating either (1) the legal basis for the "power of inquiry" being exercised, or (2) that such exercise was "due and proper."

### 3. <u>The Procedural Standard Applicable to the Instant Motion</u>:

"A party may raise by pretrial motion any...request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2). "[A]t any time while the case is pending, the court may hear a claim that the indictment...fails...to state an offense." Fed. R. Crim. P. 12(b)(3)(B). "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (internal quotations omitted). In general, an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense." Fed. R. Crim. P. 7(c)(1).

In the Fifth Circuit, the propriety of granting a motion to dismiss the indictment under Rule 12 "is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *United States v. Flores,* 404 F.3d 320, 324 (5th Cir. 2005) (internal quotations omitted). "If a question of law is involved, then consideration of the motion is generally proper." *Id.* (internal quotations omitted). Permitting district courts to make pretrial legal determinations on undisputed facts "avoids the waste of judicial resources that results from legally meritless cases being sent to trial." *Id.* at 325-26 (internal quotations omitted).

The government and defendant agree that whether a particular congressional action constitutes an "inquiry or investigation" under 1505 is a question of law for the Court. *See* Rec. Doc. 58 at 19 note 7 and Rec. Doc. 74 at 2 (both citing *United States v. North*, 910 F.2d 843, 894 n.29 (D.C. Cir. 1990) ("whether a proceeding constitutes an 'inquiry' under § 1505 is a matter of law for the court"). The government argues that the Court is not permitted to resolve factual issues prior to trial in order to decide this legal issue. *See* Rec. Doc. 58 at 19 n.7. The defendant, on the other hand, points to the Fifth Circuit's opinion in *Flores* as authority that the Court may and should decide the threshold factual issues necessary to determining the legal question of whether the May 14 letter constituted or was issued pursuant to a duly authorized committee inquiry. In *Flores*, the Fifth Circuit stated that "a district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Flores,* 404 F.3d at 324 n. 6 (quoting *United States v. Shortt Accountancy Corp.*, 785 F.3d 1448, 1452 (9th Cir. 1986)) (internal quotations omitted).

### 4. <u>The Court's Analysis and Conclusion</u>:

Although interwoven and difficult to parse out, the instant motion presents two separate questions: (1) Did the indictment sufficiently allege a due and proper "inquiry or investigation" under section 1505, or is it fatally defective due to its failure to allege specific facts demonstrating the legal basis of the power of inquiry being exercised and that the exercise was "due and proper"? and (2) As a matter of law, does the May 14 letter constitute an "inquiry or investigation" pursuant to "the due and proper exercise of the power of inquiry" of a "committee of either House"? Although they stem from same substantive statutory language, their

procedural implications are quite different.

      **a.**    **Is the Indictment Fatally Defective for Failure to Allege Specific Facts Demonstrating the Legal Basis of the "Power of Inquiry" Being Exercised and That the Exercise Was "Due and Proper"?**

The first of these questions does not require the Court to look beyond the face of the indictment or to determine whether the allegations are in fact true. To answer this question, the Court takes the allegations as true and simply asks whether they are adequate to state the offense. As discussed above, the indictment alleges that the Subcommittee had "commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well" and that Rainey endeavored to obstruct the "due and proper exercise of the power of inquiry under which an inquiry and investigation was being had." Rec. Doc. 1 at ¶¶ 22, 28. The insufficiency asserted is that the indictment fails to allege specific facts demonstrating that the inquiry was authorized. In other words, the defense argues that the indictment fails to specify the legal basis for the "power of inquiry" being exercised or to allege specific facts demonstrating that such exercise was "due and proper." At least one court has referred to this as the "jurisdictional" requirement of section 1505. *See United States v. North*, 708 F. Supp. 385, 386 (D.D.C. 1988) ("Section 1505 contains a jurisdictional element. The obstruction must occur during the due and proper exercise by Congress of its power of inquiry.").

The Court agrees with the defendant that a congressional inquiry or investigation comes within section 1505's ambit only if it (1) is within the committee's "power of inquiry" and (2) constitutes a "due and proper exercise" of such power. This is clear from the plain language of the statute. Section 1505 does not protect *ultra vires* acts. Indeed, it is not the inquiry or investigation itself that the defendant is charged with obstructing; it is the "due and proper

11

exercise of the power of inquiry under which [such] inquiry or investigation is being had" that a defendant must endeavor to obstruct in order to trigger criminal liability under section 1505. 18 U.S.C. § 1505. Thus, in order to constitute an "inquiry or investigation" within the meaning of section 1505, the inquiry must satisfy these basic requirements.[9]

However, the question presented here is whether the indictment is fatally infirm for failing to allege the specific details of the Subcommittee's authority. In general, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling*, 418 U.S. at 117 (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)). "The validity of an indictment is governed by practical, not technical considerations." *United States v. Ramos*, 537 F.3d 439, 459 (5th Cir. 2008) (internal quotations omitted), *cert.*

---

[9] For reasons discussed below, the Court need not decide at this juncture whether formal authorization (*i.e.*, authorization in accordance House, Committee, and Subcommittee rules) is required under § 1505 as it is under 2 U.S.C. § 192, *see Gojack v. U.S.*, 384 U.S. 702 (1966), or whether it is enough that the inquiry be "a legitimate exercise of investigative authority by a congressional committee in an area within the committee's purview," formal authorization simply being among the indicia of such legitimate exercise. *See Mitchell*, 877 F.2d at 300; *see also U.S. v. Cisneros*, 26 F. Supp. 2d 24, 38-39 (1998) (relying on *Mitchell*); *North*, 708 F. Supp. at 386 (relying on district court opinion in *Mitchell*); *U.S. v. Poindexter*, 725 F. Supp. 13, 22 (D.D.C. 1989) (relying on *Mitchell*).

*denied*, 129 S. Ct. 1615 (2009).  The Federal Rules of Criminal Procedure "were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure."  *Resendiz-Ponce*, 549 U.S. at 110 (quoting *U.S. v. Debrow*, 346 U.S. 374, 376 (1953)).

Nevertheless, "while an indictment parroting the language of a federal criminal statute is often sufficient, there are crimes that must be charged with greater specificity."  *Resendiz-Ponce*, 549 U.S. at 109.  In particular, where the "core of criminality" under a statute turns on a specific fact — "[w]here guilt depends so crucially upon such a specific identification of fact" — then the "indictment must do more than simply repeat the language of the criminal statute."  *Russell v. United States*, 369 U.S. 749, 764 (1962).  It must then state the critical fact.  *See United States v. Kay*, 359 F.3d 738, 756-57 (5th Cir. 2004) ("The cases in which an indictment that parrots the statute is held to be insufficient turn on a determination that the factual information that is not alleged in the indictment goes to the very core of criminality under the statute.").

The indictment here specifically alleges that the Subcommittee had "commenced an inquiry and investigation of the blowout and oil spill, including the amount of oil flowing from the well" and that Rainey endeavored to obstruct the "due and proper exercise of the power of inquiry under which an inquiry and investigation was being had."  Rec. Doc. 1 at ¶¶ 22, 28.  While it parrots the statutory language in fairly alleging that the inquiry was a "due and proper exercise" of the Subcommittee's "power of inquiry," it is devoid of any specific factual detail regarding the authority for this exercise of power.   Thus, as in *Kay*, the indictment's sufficiency in this case hinges upon a determination of whether the element in question — the authority for the inquiry in question — is core.  *Kay*, 359 F.3d at 760.

In arguing that facts supporting the authority for an inquiry must be specifically alleged, the defendant relies primarily on cases interpreting contempt of Congress under 2 U.S.C. § 192. Section 192 makes it a crime for a person summoned as a witness "by the authority of either House of Congress" to testify upon "any matter under inquiry before either House or any joint committee...or any committee of either House" to "refuse[] to answer any question pertinent to the question under inquiry."[10]  2 U.S.C. § 192.  In *Russell, supra*, the Supreme Court held that because the criminality of a refusal to answer a question turns upon the question's "pertinency to the subject under inquiry," "the indictment must identify the subject which was under inquiry at the time of the defendant's alleged default or refusal to answer."  369 U.S. at 764, 754.

Later, in *Gojack*, a "sequel" to *Russell*,[11] the Court went further and held that in order for liability to attach under section 192, the subject of the inquiry must be specified and *authorized* in accordance with the committee's own rules and, where the inquiry is before a subcommittee, there also must have been "a lawful delegation of authority to the Subcommittee to conduct the

---

[10]  Section 192 provides:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

2 U.S.C. § 192

[11]  Both *Russell* and *Gojack* arose from a group of companion cases wherein persons had been indicted for refusing to answer questions before a subcommittee of the House Committee on Un-American Activities.

investigation." *Gojack v. United States*, 384 U.S. 702, 705 (1966). The Court stated: "There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized." *Id.* at 708. The Court found that not only had the Committee failed to authorize its own investigation, but had also "failed to specify the subject of the inquiry that the Subcommittee was to undertake." *Id.* at 714. "If the contempt occurs before a subcommittee, the line of authority from the House to the Committee and then to the subcommittee must plainly and explicitly appear, and it must appear in terms of a delegation with respect to a particular, specific subject matter." *Id.* at 716. "Absent proof of a clear delegation to the subcommittee of authority to conduct an inquiry into a designated subject, the subcommittee was without authority which [could] be vindicated by criminal sanctions under § 192...." *Id.*

Although *Gojack* spoke in terms of proof and did not state expressly that such facts regarding a committee's authorization must be specifically detailed in the indictment, the *Gojack* court did state "that a clear chain of authority from the House to the questioning body is an *essential element* of the offense," which would suggest that it must be identified in the indictment. *Id.* at 716 (emphasis added). Also, the language in the Court's holding that the line of authority "must plainly and explicitly *appear*" suggests that such authority must appear in the indictment.[12] *Id.* (emphasis added). Moreover, the *Gojack* court cited and quoted with approval the opinions in *Lamont* and *Seeger*, both of which expressly held that a committee's authority to

---

[12] Although the Court could have meant that evidence of such line of authority must appear in the record as opposed to the indictment, the former seems more likely, particularly given that the *Gojack* court viewed the case before it as a "sequel" to *Russell*, which dealt expressly with what must appear in the indictment. *Gojack*, 384 U.S. at 703.

conduct the inquiry in question must be specifically alleged in the indictment. *United States v. Seeger*, 303 F.2d 478 (2nd Cir. 1962); *United States v. Lamont*, 18 F.R.D. 27 (S.D.N.Y. 1955), *aff'd*, 236 F.2d 312 (2nd Cir. 1956). The *Lamont* court stated:

> If the government contends, as eventually it must to sustain a conviction, that the Permanent Subcommittee on Investigations was a duly authorized committee and engaged in conducting an investigation within the scope of delegated authority, then this, together with the source of its claimed authority, whether it be a resolution of the Senate or the parent committee, should be alleged in the indictment.
>
>     \*     \*     \*     \*
>
> The cornerstone of the Government's case in any prosecution under § 192 must be a lawfully constituted committee engaged in an inquiry within the scope of its authority when the refusal to answer occurred. This is the hard core of its case against the defendant and he is entitled to have it pleaded in the indictment. The obscurity of the committee's origin points up the need for such an allegation. It is not sufficient, as the Government now suggests, that this proof will be offered upon the trial. If the Grand Jury did not have before it prima facie evidence that the committee was empowered to conduct the inquiry whether by resolution or otherwise, there was no basis for the return of the indictment.... And if in fact there was no grant of authority to the committee, or if it exercised powers in excess of the authority granted, or which could be granted, there is no reason why the defendants should be forced to trial. If the committee was duly empowered to act and conduct the inquiry, it is a comparatively simple matter to establish this fact and to enable a Grand Jury to make the appropriate allegation in the indictment. It may well be that some resolution or authorization exists but thus far it has not been revealed.
>
>     \*     \*     \*     \*
>
> Whether the committee was ever vested with power should not be a matter of guesswork on the part of the defendant charged with a crime. And if a defendant is to have a fair opportunity to defend himself he is entitled to be informed of the charge and to have the indictment specify that the committee whose authority he allegedly flouted was duly authorized to conduct the inquiry — just as the indictment must plead every other essential element. An element of crime is an essential factor without which there is no crime. And if no authority was ever delegated to the Permanent Subcommittee by the parent committee or the Senate, there is no basis for prosecution under § 192 no matter how contumacious a witness might have been.

*Lamont*, 18 F.R.D. at 33, 35, 36 (footnotes omitted). The *Seeger* court held likewise, quoting

extensively from *Lamont*. *Seeger*, 303 F.2d at 482-83. Under this standard, the indictment in this case would plainly fail.

The Court finds the reasoning of *Lamont* and *Seeger* quite persuasive. Obviously, *Gojack, Lamont*, and *Seeger* concerned a different statute than the one before the Court in this case. Contempt and obstruction statutes target different conduct. Yet, they are not so different as the government would have the Court find. Although obstruction statutes generally may be construed broadly in contrast to contempt, the Fifth Circuit has cautioned that *all* criminal statutes are to be strictly construed and that section 1505 is no exception. *United States v. Reeves*, 752 F.2d 995, 999 (5th Cir.), *cert. denied*, 474 U.S. 834 (1985). Moreover, a broad construction is not needed to find that to be covered under section 1505 an inquiry must have been had under a "due and proper exercise" of the committee's "power of inquiry." The language is plain. Nor does the term "authority" feature any more prominently in section 192 than the terms "power of inquiry" and "due and proper exercise" do in section 1505. They are referenced in a similar manner. If there is a difference between the statutory texts in this regard, it is that a committee's proper exercise of its investigative power plays a more central role in the statutory text of section 1505 than it does in section 192.

However, determining the sufficiency of factual detail in an indictment is a common sense endeavor, not an exercise in formality. There is no bright line. *Kay*, 359 F.3d at 759 ("The line between deficient and sufficient factual detail in an indictment is not a bright one."). Although a due and proper exercise of authority could certainly be described as "core" in the sense that liability may ultimately hinge on it, the same can be said for every essential element of every crime. Yet, the general rule is that important elements ordinarily can be alleged

17

sufficiently by tracking the statutory language.  *See Kay*, 359 F.3d at 759 ("as important to the statute as the business nexus element is, it does not go to the [statute's] core of criminality. ... Therefore, the indictment's paraphrasing of the [statute] passes the test for sufficiency, despite alleging no details...").   The "core" exception applies where more particularity is needed to give notice of the offense being charged.   As the Fifth Circuit explained in *Kay*:   "the question is whether the lack of detail in that part of the indictment that deals with this one element is more like an absence of detail as to how the crime was committed than a failure to specify what the crime was."  359 F.3d at 759.  Here, more detail of the Subcommittee's authority is not needed in order to specify the crime being charged.    Thus, the Court does not find the indictment insufficient on this basis.

Accordingly, insofar as it seeks to strike Count One on the basis of insufficient detail regarding authorization for the inquiry, the instant motion will be denied.

> **b.**      **As a Matter of Law, Does the May 14 Letter Constitute an "Inquiry or Investigation" Issued Pursuant to "The Due and Proper Exercise of the Power of Inquiry" of a "Committee of Either House"?**

The second question raised in the instant motion — whether as a matter of law the May 14 letter constitutes an "inquiry or investigation" within the scope of section 1505 — goes beyond the adequacy of the indictment and tests the legal sufficiency of the government's theory of the case.   It entails both the issue of whether the May 14 letter was an inquiry by a "committee" (as opposed to an individual member) and whether the letter was authorized (*i.e.*, a

18

"due and proper exercise" of the committee's "power of inquiry"). Answering this question does not require the Court to accept the truth of the allegations in the indictment. Although it requires the Court to determine certain facts, it is not a question for the jury. Both sides agree that it is a question of law for the Court. *See* Rec. Doc. 58 at 19 note 7 and Rec. Doc. 74 at 2 (both citing *North*, 910 F.2d at 894 n.29).

The government argues strenuously that the Court should not and *cannot* decide these issues prior to trial. Yet the Fifth Circuit is very clear in *Flores* that "a district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Flores,* 404 F.3d at 324 n. 6 (internal quotations omitted). The government fails to explain with any specificity how making the findings inherent in the instant question of law would "invade the province" of the jury.

The Court need not untangle this procedural knot today, however. First, the Court does not find that the questions raised can be answered from the handful of letters presently before the Court. Indeed, it is difficult to fathom making the findings required without the benefit of an evidentiary hearing. Second, and more importantly, the Court has concluded that Count One must be dismissed on other grounds, as discussed below. Therefore, insofar as it seeks a determination of whether as a matter of law the May 14 letter constitutes an "inquiry or investigation" under section 1505, the Court will deny the instant motion without prejudice.

**B.** *Pretrial Motion No. 2*: **Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Failure to Allege Knowledge of a Pending Congressional Investigation (Rec. Doc. 41):**

In his second motion, the defendant argues that Count One of the indictment must be dismissed because it fails to allege an essential element of the offense, namely, that Rainey knew of the pending congressional investigation that he is charged with obstructing.

### 1. The Essential Elements of Obstruction of a Congressional Inquiry in Violation of 18 U.S.C. § 1505:

To state an offense under section 1505, an indictment must allege the following essential elements: (1) that an "inquiry or investigation [was] being had by either House, or any committee of either House or any joint committee of the Congress," 18 U.S.C. § 1505; (2) that the defendant knew of the pending inquiry or investigation; and (3) that the defendant "corruptly... endeavor[ed] to influence, obstruct, or impede... the due and proper exercise of the power of inquiry under which [such] inquiry or investigation [was] being had," 18 U.S.C. § 1505. *See United States v. Johnson*, 71 F.3d 139, 144 (4th Cir. 1995).[13]

The government concedes that "[o]ne of the essential elements of a Section 1505 charge requires the government to prove that the defendant was aware of the congressional proceeding

---

[13] Unlike in *Johnson*, wherein the court separated the *mens rea* requirement into a separate fourth element, this Court has conflated the *mens rea* element into the third element in accordance with the agency proceeding cases cited by both the government and the defendant. *See, e.g.*, *United States v. Warshak*, 631 F.3d 266, 325 (6th Cir. 2010); *States v. Price*, 951 F.2d 1028, 1031 (9th Cir.1991); *United States v. Sunia*, 643 F. Supp. 2d 51, 80 (D.D.C. 2009) (citing *United States v. Quattrone*, 441 F.3d 153, 174 (2nd Cir. 2006)).

with which he is charged with obstructing." Rec. Doc. 58 at 35. Moreover, the government does not dispute that the indictment fails to state that Rainey knew of the particular congressional inquiry or investigation that he is charged with obstructing — specifically, the inquiry and investigation which allegedly had been commenced by the Subcommittee on Energy and Environment of the Committee on Energy and Commerce of the House of Representatives. *See* Indictment at ¶¶ 22, 28. Instead, the government argues that other allegations in the indictment are sufficient to imply this element of actual knowledge.

The defendant attacks the government's response on two fronts. First, the defendant cites case law demonstrating that in the Fifth Circuit, the indictment must allege each essential element of the crime charged. It is not enough that the allegations might permit one to infer the element. Second, the defendant argues that even if it were permissible for the Court to infer the existence of an essential element such as actual knowledge where none is alleged, the allegations in this indictment do not permit a reasonable inference of the actual knowledge required.

### 2. Under Fifth Circuit Precedent, the Grand Jury Clause of the Fifth Amendment Requires that the Indictment Allege Each Essential Element of a Federal Felony Offense:

The defendant argues that under well established Fifth Circuit case law, implication of facts supporting an essential element of the crime charged does not pass muster under the Fifth Amendment. Instead, each essential element of the crime charged must be alleged. In support of this argument, the defense cites *Walker v. United States*, 342 F.2d 22, 26-27 (5th Cir. 1965). In *Walker*, the appellant argued that the indictment on which he had been tried was deficient in that it failed to allege that the acts were done with the intent to defraud the United States, an

essential element of the crimes charged. *Id.* at 26. The Fifth Circuit agreed and dismissed several of the counts charged. In so doing, the *Walker* court stated: "It is elementary that an indictment must set forth the elements of the offense sought to be charged, and if it does not a conviction based thereon cannot stand." *Id.* With regard to the implication of essential elements, the court rejected such an approach: "While it may be said that to defraud the United States is implied, the <u>essential elements of a crime cannot be implied in an indictment</u>." *Id.* at 26-27 (emphasis added).

    *Walker* remains good law. In the almost fifty years since that decision, the Fifth Circuit has repeatedly emphasized that each essential element of the crime charged must be alleged if the indictment is to stand. *See, e.g., United States v. White,* 258 F.3d 374, 381 (5ᵗʰ Cir. 2001) ("To be sufficient, an indictment must allege each material element of the offense; if it does not, it fails to charge that offense."), *abrogated on other grds by United States v. Cotton,* 535 U.S. 625, 631 (2002). These decisions are grounded not only in the Sixth Amendment, but most strongly in the Grand Jury Clause of the Fifth Amendment. *See, e.g., United States v. Bishop,* 264 F.3d 535, 545 (5ᵗʰ Cir. 2001) ("An indictment must allege each element of the charged offense, in order to insure that the grand jury finds probable cause that the defendant committed each element, to prevent double jeopardy, and to provide notice to the accused."), *cert. denied*, 535 U.S. 1016 (2002); *United States v. Cabrera-Teran*, 168 F.3d 141, 143 (5ᵗʰ Cir. 1999) ("To be sufficient, an indictment must allege each material element of the offense; if it does not, it fails to charge that offense. This requirement stems directly from one of the central purposes of an indictment: to ensure that the grand jury finds probable cause that the defendant has committed each element of the offense, hence justifying a trial, as required by the Fifth Amendment."),

*abrogated on other grds by Cotton,* 535 U.S. at 631; *United States v. Deisch*, 20 F.3d 139, 146-47 (5th Cir. 1994) ("To guarantee the right to be tried only after indictment, the grand jury must consider and find evidence supporting all of the crime's elements....Requiring that all of the elements, rather than mere statutory citations, appear on the face of the indictment helps to ensure that the grand jury has done this."), *abrogated on other grds by Apprendi v. New Jersey*, 530 U.S. 466 (2000); *United States v. Outler*, 659 F.2d 1306, 1310 (5th Cir. 1981), *cert. denied*, 455 U.S. 950 (1982) ("There is no question that a grand jury indictment must set forth each essential element of an offense in order for a resulting conviction to stand. ... A grand jury can perform its function of determining probable cause and returning a true bill only if all elements of the offense are contained in the indictment."); *United States v. Mekjian*, 505 F.2d 1320, 1324 (5th Cir. 1974) (" [A]n indictment must set forth all essential elements of an offense in order to apprise a defendant of the charge he must meet and to protect against double jeopardy....If this requirement were to be undermined, a defendant would have no assurance that a grand jury would have returned an indictment against him.").

The Court explained the Fifth Amendment basis for this well-settled rule in *United States v. Outler*, 659 F.2d at 1310:

> "[I]f the Sixth Amendment requirements were the sole basis for this rule, then appellant would not succeed on appeal.... It is the Fifth Amendment guarantee with which we are concerned. Unless every element of an offense appears in the indictment, it is impossible to assure the defendant that a grand jury properly determined probable cause of the offense. We have little doubt that the grand jury in this case still would have returned a true bill against the appellant if the indictment had been constructed properly. Moreover, each member of the grand jury most likely considered the very element which is fatally omitted.... However, we cannot speculate. "To allow ... a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guarantee of the intervention of a grand jury was designed to secure." *Russell v. United States*, 369 U.S. at 770... .

*Id.* at 1310.  This constitutional underpinning was affirmed again in *United States v. Deisch*, 20

F.3d at 145-46:

> [I]t is not enough that the grand jury concludes that the defendant should be
> prosecuted for violating a particular statute; rather, the indictment must also allege
> every element of the offense.  Only in this way is any assurance furnished that the
> grand jury found probable cause to believe that the defendant in fact committed acts
> constituting the offense in question.  This clearly appears from the reason so often
> given for the rules that the failure of the indictment to allege all elements of the
> offense may not be cured by evidence or instructions at trial, nor by a bill of
> particulars...namely, that absent such rules there is lacking the necessary assurance
> the grand jury found probable cause to believe the defendant committed acts
> constituting all elements of the offense of conviction as proved at trial.

*Id.* at 145-46 (footnotes omitted).   The validity of the rule and its Fifth Amendment rationale

was reinforced again in *United States v. Gonzalez*, 259 F.3d 355, 360 n. 3 (5th Cir. 2001), *cert.*

*denied*, 537 U.S. 1038 (2002):

> While [defendant's stipulation as to drug quantity accounts for Sixth Amendment
> concerns regarding] notice, it contravenes another purpose an indictment serves:
> assurance that the grand jury found probable cause for each of the elements of an
> offense....  Events subsequent to the issuance of the indictment do little to inform us
> of the elements of an offense for which the grand jury found probable cause; instead,
> the indictment itself is the sole record of the grand jury's probable cause findings.
> It is this purpose that has caused us, in spite of the absence of a lack of notice, to
> reject attempts to cure facially deficient indictments with evidence adduced at trial
> or, in the guilty plea context, with a criminal complaint.

*Id.* at 360 n. 3.

In light of this purpose, the Fifth Circuit has required that each essential element of the

charged offense "must be alleged *in haec verba* or by words of similar import."  *Mekjian*, 505

F.2d at 1324; *see also Walker,* 342 F.2d at 26-27 ("essential elements of a crime cannot be

implied in an indictment").   This provides assurance that the grand jury found probable cause to

believe that each essential element of the offense was met.  "The similar import doctrine

advances the policy, reflected in F.R.Cr.P. 7(c), against fine-combing indictments for technical errors.   But the words of similar import must be clear enough to insure that the indictment meets the purposes it is intended to serve." *Id.*

In this case, the indictment does not allege — either *in haec verba* or by words of similar import — that Rainey knew of an inquiry or investigation being had by the Subcommittee on Energy and Environment.   Moreover, even if the standard were not so strict, the allegations supporting Count One of the indictment do not even meet the reasonable inference standard advocated by the government, as discussed below.

### 3.       Even If It Were Permissible for the Court to Infer an Essential Element Not Alleged in the Indictment, the Requisite Knowledge Is Not Implicit in the Allegations of this Indictment:

The defendant argues that even if it were permissible for the Court to infer the existence of an essential element such as actual knowledge where none is alleged, the allegations in this indictment do not permit a reasonable inference that the grand jury considered and found the requisite knowledge on the part of Rainey.  The Court agrees.  It is not enough that the indictment obliquely suggest that the defendant was aware of a request emanating from some person or group associated with Congress.  *See United States v. Sunia*, 643 F. Supp. 2d 51, 79 (D.D.C. 2009); *United States v. Perraud*, 672 F. Supp. 2d 1328, 1346-51 (S.D. Fla. 2009).  To allege obstruction of a congressional inquiry under section 1505, the indictment must allege (1) that an "inquiry or investigation [was] being had by either House, or any committee of either House or any joint committee of the Congress," (2) that the defendant knew of such pending

inquiry or investigation, and (3) that the defendant corruptly endeavored to obstruct "the due and proper exercise of the power of inquiry" under which such inquiry or investigation was being had. 18 U.S.C. § 1505; *see Johnson*, 71 F.3d at 144; *Warshak*, 631 F.3d at 325. Thus, the knowledge that is required to allege a violation of section 1505 is knowledge of the inquiry or investigation that the defendant is charged with obstructing, in this case, the investigation by the Subcommittee on Energy and Environment of the House Committee on Energy and Commerce. Rec. Doc. 1 at ¶¶ 22, 28. The government does not contend otherwise.

In opposition to the motion, the government argues that the knowledge element is implicit in two separate allegations contained in the indictment. First, the government points to the allegations of paragraph 23: "On or about May 4, 2010, in response to a Congressional request for a briefing of members and staff of Congress, defendant...falsely informed the Subcommittee that 5,000 BOPD was the most accurate flow-rate estimate. Defendant...further stated to Congress that...the worst case scenario [of 60,000 BOPD] was not possible...." *Id.* at ¶ 23. The government contends that this is the equivalent of alleging that "as of May 4, 2010, the defendant was already on notice that the Subcommittee was conducting an inquiry or investigation into matters related to the oil spill, including the flow rate of oil." Rec. Doc. 58 at 27. The Court disagrees. The actual indictment states that the May 4 briefing was "in response to a Congressional request for a briefing of members and staff of Congress," not in response to any request by the Subcommittee or for a briefing to the Subcommittee. Accepting this allegation on its face, it simply does not follow therefrom that Rainey was aware that the Subcommittee on Energy and Environment was conducting an inquiry or investigation within the

meaning of section 1505. At most, it implies that Rainey knew that someone in Congress had requested "a briefing of members and staff of Congress."[14] As discussed above, the inference of such oblique knowledge is not sufficient to allege a violation of section 1505.

Second, the government points to the allegation in paragraph 25 of the indictment, which states: "On or about May 21, 2010, defendant...began working on a response to the May 14 Congressional request. Defendant...was the primary source of flow-rate information for BP's eventual written response to Congress on or about May 24, 2010...." *Id.* at ¶ 25. The government argues that the knowledge element is implicit in this allegation because "the defendant can only help to prepare a response to the Subcommittee's inquiry or investigation if he is aware of that proceeding." Rec. doc. 58 at 28. Yet, this argument, too, rests on a *non sequitur*. The indictment does not state that Rainey worked to prepare a response to the Subcommittee's inquiry or investigation. Rather, it states that he began working on a response "to the May 14 Congressional request." *Id.* at ¶ 25.[15] Accepting this allegation on its face, it does not follow therefrom that Rainey was aware that the Subcommittee on Energy and

---

[14] As discussed above in connection with the first pretrial motion, the defendant has presented evidence that the May 4 "briefing" was not a briefing of the Subcommittee but an informal telephone conference with members of two different subcommittees "just so members who are very interested in the spill can have the basic facts about what is happening regarding the incident." *See* Rec. Doc. 41-2. The government strongly objects to the consideration of any such evidence. The Court need not and does not consider the evidence, for the indictment is deficient on its face.

[15] The government does not point to the allegations in paragraph 24, but they do not help the matter. Paragraph 24 alleges that on May 14, 2010, "the then-Chairman of the Subcommittee...sent a letter to BP accusing it of understating the amount of oil leaking from the well." Rec. Doc. 1 at ¶ 24. It does not allege that the letter was sent by or on behalf of the Subcommittee or that the letter contained any information that would have put BP or Rainey on notice that the Subcommittee had commenced an inquiry or investigation into the spill.

Environment was conducting an inquiry or investigation.   At most, it implies that Rainey knew of a "Congressional request."   As set forth above, an inference of such nonspecific awareness does not satisfy the actual knowledge requirement of section 1505.

In short, the indictment alleges no facts that would permit a reasonable inference that Rainey knew that an inquiry was being conducted by the Subcommittee on Energy and Environment and that the May 4, 2010 "Congressional request for a briefing of members and staff of Congress" or the May 14, 2010 letter to BP were connected to any such inquiry.

### 4.      Conclusion as to Pretrial Motion No. 2:

Count One charges the defendant with obstructing an inquiry and investigation which was being had by the "Subcommittee on Energy and Environment of the Committee on Energy and Commerce."  Rec. Doc. 1 at ¶ 28.   Because it is an essential element of this crime that the defendant knew of this inquiry and investigation, the indictment must allege such knowledge.  It does not.  Even construing the allegations strongly in the government's favor, it is simply impossible to ascertain from the indictment whether this essential element was presented to and found by the grand jury.  Consequently, Count One of the indictment must be dismissed.


C.      *Pretrial Motion No. 3*:  **Defendant David Rainey's Motion to Dismiss
Count One of the Indictment on Grounds that Section 1505 Does Not
Apply to Subcommittee Investigations (Rec. Doc. 43):**

In his third motion, the defendant seeks to dismiss Count One on grounds that section 1505 does not encompass subcommittee investigations.   The basis of the motion is the plain and clear statutory text, which criminalizes the obstruction of "the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or <u>any</u>

committee of either House or any joint committee of the Congress." 18 U.S.C. § 1505 (emphasis added). Although subcommittees exist in both Houses of Congress, the statute does not contain the word "subcommittee." Thus, the defendant argues that the Court should not enlarge the statute to include subcommittees.

The government, on the other hand, argues that a subcommittee is a type of committee and that the term "any committee of either House" must be read to include subcommittees. The government argues that such a broad reading is important in light of section 1505's purpose, which is to punish the obstruction of all congressional inquiries, many of which are carried out by subcommittees.

### 1. Section 1505 Cases Arising out of Subcommittee Inquiries:

In support of its position, the government cites three cases which address section 1505 prosecutions arising out of subcommittee investigations. *See United States v. Weissman*, 195 F.3d 96 (2nd Cir. 1999); *United States v. Lavelle,* 751 F.2d 1266 (D.C. Cir. 1985); *United States v. North,* 708 F. Supp. 372 (D.D.C. 1988). However, as the defendant points out, the applicability of the statute to subcommittee inquiries was not presented, argued, disposed of, or even mentioned in any of these cases. Thus, they do not aid in the inquiry here.

### 2. The Government Cites Contempt Cases Under Section 192:

Second, the government points to decisions addressing the congressional contempt statute at 2 U.S.C. § 192, which contains nearly identical language.[16] In particular, the government relies on *Barenblatt v. United States*, 240 F.2d 875, 878 (D.C. Cir.), *vacated*, 354

---

[16] Section 192 applies to inquiries "before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, *or any committee of either House of Congress*." 2 U.S.C. § 192 (emphasis added).

U.S. 930 (1957). Like *Russell*, *Gojack*, and *Seeger* (discussed *supra* in connection with the first pretrial motion), *Barenblatt* arose out of a witness' refusal to answer certain questions before a subcommittee of the House Committee on Un-American Activities.[17] The *Barenblatt* court rejected the appellant's argument that the term "committee of either House" should not be extended to subcommittees:

> It is also contended that the indictment is fatally defective in that it alleges a refusal to answer questions before a subcommittee of a committee, and that Congress did not intend to make it a crime to refuse to answer questions of a subcommittee. Appellant urges that Congress was fearful of having penal sanctions imposed upon those who refused to answer questions propounded by subcommittees, as Congress considered subcommittees more subject to partisanship and more likely to abuse their powers than full committees. We disagree. Nothing has been shown which reflects that Congress has indicated such belief. We can only construe the statute in the light of the obvious purpose for its enactment. That purpose was to discourage the impairment of the vital investigative function of Congress. The function Congress sought to protect is as often committed to subcommittees as it is to full committees of Congress, as indeed it must be. Construing the statute in a manner consistent with its obvious purpose, we hold that Congress intended the word 'committee' in its generic sense, which would include subcommittees.

*Barenblatt*, 240 F.2d at 878. The Court agrees that the pertinent language in section 192 is substantially similar to that in section 1505, such that a well reasoned opinion applying section 192 would be helpful here. However, the Court finds the reasoning in *Barenblatt* to be teleological. Rather than grounding its analysis in the text of the statute, the court construed the text to accomplish its perception of Congress' purpose. While such methods of interpretation might be permissible in a non-criminal case, where a Court has more leeway to chose among reasonable interpretations, such is not the case here. As discussed more fully below, where a criminal defendant's strict reading of a criminal statute is reasonable, the court is not free to

---

[17] *See Russell v. United States*, 369 U.S. 749 (1962); *Gojack v. United States*, 384 U.S. 702 (1966); *United States v. Seeger*, 303 F.2d 478 (2nd Cir. 1962).

choose among reasonable interpretations the version that (in the court's view) represents better policy or better accomplishes a perceived broad congressional purpose. Unless the "text, structure, and history...establish that the Government's position is *unambiguously* correct," the court must construe the statute in the defendant's favor. *United States v. Granderson*, 511 U.S. 39, 54 (1994) (emphasis added). Because the short analysis in *Barenblatt* does not reveal that the court followed these well established rules, this Court does not find it to be helpful here.

The government also seeks support in *dicta* in *Gojack* and *Seeger*, the two key cases that the government struggled to distinguish and distance in connection with the question of committee authorization. The government only quotes the phrase in *Gojack* that appears to support its argument. However, a closer examination of the "subcommittee" discussion in *Gojack* reveals that the Supreme Court was quite circumspect about extending section 192 liability to subcommittee inquiries. Indeed, for the *Gojack* court, the *dicta* concerning the question of extending section 192 liability to subcommittees and the Court's holding requiring a specific delegation of authority for the particular subject of inquiry were inextricably entwined, so much so that one cannot fairly embrace the *dicta* without also endorsing the holding. After concluding that the Committee on Un-American Activities had failed to authorize the inquiry in accordance with its own rules, the *Gojack* court proceeded to discuss the additional problem of the Committee's failure to properly delegate authority to the subcommittee:

> There is in this case another fatal defect. The hearings in which petitioner was called to testify were before a Subcommittee of the House Committee on Un-American Activities. Pursuant to Committee authorization, the Chairman on February 9, 1955, appointed a Subcommittee of three members to conduct hearings at which three named witnesses, including petitioner, were to be called. Neither the resolution nor any minutes or other records of the Committee stated the subject matter committed to the Subcommittee or otherwise described or defined its jurisdiction in terms of subject matter. Once again, we emphasize that we express no view as to the

appropriateness of this procedure as a method of conducting congressional business. But, once again, we emphasize that we must consider this procedure from the viewpoint not of the legislative process, but of the administration of criminal justice, and specifically the application of the criminal statute which has been invoked. Viewed in this perspective, the problem admits of only one answer. *Courts administering the criminal law cannot apply sanctions for violation of the mandate of an agency — here, the Subcommittee — unless that agency's authority is clear and has been conferred in accordance with law.*

We do not question the authority of the Committee appropriately to delegate functions to a subcommittee of its members, *nor do we doubt the availability of § 192 for punishment of contempt before such a subcommittee <u>in proper cases</u>*. But here, not only did the Committee fail to authorize its own investigation, but also it failed to specify the subject of inquiry that the Subcommittee was to undertake. * * * If the contempt occurs before a subcommittee, the line of authority from the House to the Committee and then to the subcommittee must plainly and explicitly appear, and it must appear in terms of a delegation with respect to a particular, specific subject matter. * * * *Absent proof of a clear delegation to the subcommittee of authority to conduct an inquiry into a designated subject, the subcommittee was without authority which can be vindicated by criminal sanctions under § 192....*

*Gojack*, 384 U.S. at 713-16 (footnotes omitted) (emphasis added). Thus, the *dicta* on which the government relies (the second italics) is qualified by and must be read in conjunction with the holding (the first and third italics). They are inseparable. Section 192 may extend to contempt before a subcommittee but only in cases where the delegation of authority to such subcommittee for the particular inquiry "is clear and has been conferred in accordance with law." *Id.* at 714.

Likewise, in *Seeger*, the court made clear "that the Government must establish that a committee or subcommittee was duly authorized and that its investigation was within the scope of the delegated authority" and that "an indictment under Section 192 is defective if the authority is not pleaded." *Seeger*, 303 F.2d at 482. The court reasoned that "[a] defendant, faced with possible loss of liberty, should not, at the commencement of the prosecution, be made to guess whether the inquiring body had power to exact his testimony." *Seeger*, 303 F.2d at 485. Thus,

*Seeger*'s *dicta* (based solely on *Barenblatt*) that section 192 "applies to subcommittees as well as to committees of Congress" cannot be divorced from its context, which reveals a serious concern that section 192 be applied to subcommittee inquiries only where the subcommittee's delegated authority for the inquiry is clear and specified in the indictment. Given this context (which is highly pertinent in this case given the questions that have been raised concerning authorization) and that the question here was not presented in *Gojack* or *Seeger*, the Court does not find that the *dicta* in these cases substantially aids the government's argument.

### 3.     The Defendant Cites Legislative History:

The defense argues that its reading of the statute is supported by the legislative history of section 1505. In particular, the defense points to two separate occasions on which Congress amended section 1505, leaving its "committee" language untouched, while in the very same legislation amending another statute to include the term "subcommittee." *See* False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459 (amending definition applicable to 1505 and amending 18 U.S.C. § 1001 to include "any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate") (emphasis added); Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 927, 927 (extending section 1505 to racketeering investigations by the Attorney General and creating 18 U.S.C. § 6002, allowing for the extension of immunity to a witness before "either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House") (emphasis added). The government argues that nothing can be gleaned from these two pieces of legislation because the legislative record does not reflect that the Congress on either occasion

ever considered the "committee" language of section 1505.   Although the legislative history is favorable to the defendant, the Court agrees with the government that it does not contain strong evidence of Congress' intent regarding the text in question.   However, it does bolster the defendant's argument that Congress knows how to include subcommittee inquiries and proceedings when it so intends.

### 4.      Black-Letter Principles of Interpreting Criminal Statutes:

"[I]t is a fundamental rubric that criminal statutes are subject to strict construction." *United States v. Daniel*, 813 F.2d 661, 663 (5th Cir. 1987); *see also United States v. Londono*, 285 F.3d 348, 353 (5th Cir. 2002) ("As with all criminal statutes and rules, we must construe this sentencing provision strictly and in the defendant's favor."); *United States v. Haga*, 821 F.2d 1036, 1038 (5th Cir. 1987) ("'[T]he reach of a criminal offense statute is governed by 'the traditional canon of construction which calls for the strict interpretation of criminal statutes...in favor of defendants where substantial rights are involved.'") (quoting *Smith v. United States*, 360 U.S. 1 (1959)).  Section 1505 is no exception.  *Reeves*, 752 F.2d at 999.

The starting point must be the plain language of the statute.  *In re Amy Unknown*, 701 F.3d 749, 759 (5th Cir. 2012).   A court is "authorized to deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress."  *United States v. Rodriguez-Rios*, 14 F.3d 1040, 1044 (5th Cir. 1994).   Thus, a court must follow the plain meaning unless it "can[ ] say that [it] is so bizarre that Congress 'could not have intended' it."  *Id.* at 1045 (quoting *Demarest v. Manspeaker*, 498 U.S. 184, 191 (1991)) (internal quotations omitted); *Amy*, 701 F.3d at 759 (if statute's language "is plain, our 'sole function' is to 'enforce it according to its terms' so long as 'the disposition

required by the text is not absurd.' ") (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)).
The words used in statutes "should be given their ordinary, popular meaning unless Congress
clearly meant the words in some more technical sense. *United States v. National Broiler
Marketing Ass'n*, 550 F.2d 1380, 1386 (5th Cir. 1977). The court may consult legislative
history only where, after applying "principles of statutory construction, including the canons of
construction," the court concludes that the statute is ambiguous. *Amy*, 701 F.3d at 760. "For
statutory language to be ambiguous...it must be susceptible to more than one reasonable
interpretation or more than one accepted meaning." *Id.*

Finally, if after recourse to all available aids to statutory construction the court cannot
"say with certainty" that Congress intended to criminalize the conduct at issue, then the rule of
lenity requires that the court resolve the ambiguity in the defendant's favor. *United States v.
Ramos,* 537 F.3d 439, 463-64 (5th Cir. 2008); *United States v. Orellana*, 405 F.3d 360, 371 (5th
Cir. 2005) (applying rule of lenity where "[a]fter conscientiously applying...circuit's rules of
statutory construction," the court could not "say with certainty that Congress intended to
criminalize" the conduct in question). "[W]here text, structure, and history fail to establish that
the Government's position is unambiguously correct," then the court must apply the rule of
lenity. *United States v. Granderson*, 511 U.S. 39, 54 (1994); *U.S. v. Santos,* 553 U.S. 507, 513-
15, 519-20 (2008) ("Under a long line of our decisions, the tie must go to the defendant. The
rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants
subjected to them."); *see also United States v. Surtain*, Slip Op., 2013 WL 1846625 *12 (5th Cir.
May 2, 2013) (government's interpretation is not unreasonable; "[n]onetheless, because the more
lenient statutory construction is no less plausible, we must apply the rule of lenity.").

**5.    The Court's Analysis and Conclusion Regarding Pretrial Motion No. 3:**

The crux of the issue presented in this motion is whether the word "committee" in section 1505 should be read in its generic sense or should be understood in its more technical sense, as the term is used in the United States Congress.   In support of a generic connotation, the government points to the fact that the term is preceded by the word "any."   In support of a more precise, technical reading the defendant points to the fact that the term is followed by the words "of either House or any joint committee of the Congress."    Both interpretations are reasonable.   The government is correct that a subcommittee is a particular subset of a committee.   Thus, if read in its lay, generic sense, the term would encompass subcommittees.   However, inside the United States Congress, the word is a term of art.  Within Congress, the terms "committee" and "subcommittee" have distinct meanings.  *See generally* Rules of the House of Representatives, 111th Congress (2009); Rules Adopted by the Committees of the House of Representatives, 111th Congress (2009).

The government argues that it is "non-sensical" to read the term "committee" in its narrow congressional sense.   However, the Court does not find the defendant's interpretation to be non-sensical, absurd, or even unreasonable.   Congress distinguishes between subcommittees and committees in numerous ways, both in its rules and the legislation it enacts.  *See, e.g.,* False Statements Accountability Act of 1996 and Organized Crime Control Act of 1970.   Indeed, an electronic search of the United States Code reveals dozens of instances in which subcommittees are identified and/or treated separately from committees.   The Court can find no absurdity resulting from Congress' choosing to do so in this case.   Certainly, it is not "so bizarre that Congress 'could not have intended' it." *Rodriguez- Rios*, 14 F.3d at 1045 (quoting *Demarest*, 498 U.S. at 191).

The Court finds that the defendant's interpretation has a firmer grounding in the statutory text than the government's does. The phrase "any committee *of either House...of the Congress*" is strong indication that the word "committee" should be read as the term is used and understood in the United States Congress. The context also supports this interpretation. However, it cannot be said that the government's interpretation is unreasonable, certainly not in light of the *Gojack dicta* regarding a similar statute. Faced with two reasonable interpretations, the Court looks to legislative history. Neither side has offered evidence of Congress' original intent regarding the meaning of the word "committee." The subsequent history presented by the defense, although it tends to support the defendant's interpretation, is not decisive. *See* discussion *supra*. Thus, this is one of those rare situations where the rule of lenity becomes operable.

The government argues that adopting the defendant's interpretation would undermine the entire purpose of section 1505. *See* Rec. Doc. 58 at 42 of 48. However, the government has presented no legislative history demonstrating that Congress intended to reach subcommittee inquiries. Consequently, to impute this purpose to Congress requires the Court to speculate, an invitation it must decline. *See Santos*, 553 U.S. at 515 ("When interpreting a criminal statute, we do not play the part of a mindreader...." and "reject[] the impulse to speculate regarding a dubious congressional intent. '[P]robability is not a guide which a court, in construing a penal statute, can safely take.'") (quoting *United States v. Wiltberger*, 5 Wheat. 76 (1820)). To "resolve the statutory ambiguity in light of Congress's presumptive intent" to criminalize broadly "turns the rule of lenity upside down." *Id.* at 519.

Considering that after consulting the text, context, and legislative history the Court cannot "say with certainty" that Congress intended section 1505 to reach subcommittee inquiries, Count One must be dismissed for this reason as well. *Ramos*, 537 F.3d at 464.

**D.** *Pretrial Motion No. 4*: **Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Vagueness (Rec. Doc. 45):**

In his fourth pretrial motion, the defendant moves to dismiss or narrow Count One on grounds that section 1505 is unconstitutionally vague as applied to Rainey. The defendant argues that in trying to cure the statute's vagueness by defining the term "corruptly," Congress compounded the problem by using the arguably more vague term "improper purpose." On this basis, the defendant argues that he had no fair notice that section 1505 could punish his conduct, particularly regarding allegations that he "omitted" or "did not disclose" information in preparing responses to congressional requests, given that he was under no legal duty to produce the information. Because the Court has already determined that Count One must be dismissed on statutory grounds and for failure to state an offense, the Court need not reach this issue of whether Count One is also subject to dismissal or reformation on grounds of constitutional vagueness. Accordingly, this motion will be denied as moot without prejudice.

**E.** *Pretrial Motion No. 5*: **Defendant David Rainey's Motion to Exclude the August 2, 2010 Flow-Rate Estimates and the Report of the Flow Rate Technical Group (Rec. Doc. 53):**

In his fifth pretrial motion, the defendant moves to exclude from evidence, pursuant to Federal Rules of Evidence 401 and 403, and strike from the indictment, pursuant to Federal Rule of Criminal Procedure 7(d), any reference to (a) the 53,000 BOPD and 62,000 BOPD flow-rate estimates, and the 4.9 million barrel total volume estimate, announced on August 2, 2010 (*see* Indictment at ¶ 20); and (b) any Flow Rate Technical Group report containing or supporting these estimates. Paragraph 20 of the indictment alleges that the Flow Rate Technical Group ("FRTG") announced on August 2, 2010 its conclusion that the flow rate was 53,000 BOPD at the time of shut-in and had been 62,000 BOPD immediately after the blowout. The 53,000

38

BOPD estimate was based on actual measurements taken at the wellhead during the shut-in of the well in July 2010, and the 62,000 BOPD estimate was reached by using post-shut-in monitoring of the well to extrapolate from the shut-in flow to times prior to shut-in. *See, e.g.,* Rec. Doc. 53-14 at page 6 of 9. The defense argues: (1) that these conclusions are irrelevant to the charges against Rainey because they were based on methods that are entirely different from those allegedly used by Rainey in May 2010 and that were unavailable to anyone prior to the shut-in; (2) that allowing such allegations and evidence before the jury will be confusing and highly prejudicial because it implies that Rainey should have known this data and conducted similar analyses in May 2010, when in fact such analyses were impossible; (3) that the quasi-official nature and alleged independence of the FRTG and its report would only compound the unfair prejudice by giving the numbers an air of irrefutability; and (4) that allowing the allegations and evidence before the jury will turn the trial — which should be about what Rainey knew and believed about the flow rate in May 4 to 24, 2010 — into a trial about what the flow rate actually was, necessitating a multiple-week-long "trial within a trial" — likely adding months to trial preparation — on an issue wholly irrelevant to the charges against Rainey.[18]

Having carefully examined the motion papers, it does not appear that the allegations of paragraph 20 or the disputed evidence could have any possible relevance to Count Two. Thus, given that the indictment will likely be reformed in light of the Court's dismissal of Count One, the instant motion will be denied without prejudice as moot.

---

[18] As the defense points out, counsel in the MDL (*In re: Oil Spill by the Oil Rig "Deepwater Horizon,"* MDL No. 2179) have been working for months to prepare for the Phase Two trial, in which the court in that case will determine precisely these issues. *See* Misc. Action 10-2179 (E.D. La.), Rec. Docs. 8123, 8123-1 (time line for Phase II preparation) and 6592 (Phase II shall include "Quantification of Discharge" issues, which "shall consist of issues pertaining to the amount of oil actually released into the Gulf of Mexico as a result of the Incident....").

F.    *Pretrial Motion No. 6*:  **Defendant David Rainey's Motion for a Bill of Particulars (Rec. Doc. 47):**

In his sixth pretrial motion, the defendant moves pursuant to Rule 7(f) for an order directing the government to provide a bill of particulars specifying the following matters:

1.    Identification of all respects in which Rainey's May 17, 2010 memorandum was allegedly "false and misleading" that are not otherwise alleged in paragraphs 19(a) through 19(e) of the Indictment. (Ind. ¶ 19);

2.    Identification of the "data and other inputs" that Rainey allegedly "knew were inaccurate," as alleged in paragraph 19©;

3.    Identification of all documents and information allegedly omitted from the memorandum by Rainey not otherwise alleged in paragraph 19(d);

4.    Identification of all manners in which BP's response allegedly "made false and misleading statements to Congress," "withheld and concealed," and "impeded Congress's inquiry and investigation" not otherwise alleged in paragraphs 26(a) through 26(k).

5.    Identification of the "other BP internal information" of which Rainey was allegedly aware during the May 4, 2010 briefing, allegedly "indicating that the actual flow . . . was likely much higher than 5,000 BOPD." (Ind. ¶ 23);

6.    Identification of all "other information contradicting the 5,000 BOPD estimate" that Rainey was allegedly aware of and allegedly withheld from "other BP employees and from BP in-house and outside lawyers with whom he was working on the BP response." (Ind. ¶ 25);

7.    Identification of the "false and misleading responses to the Congressional request" that Rainey allegedly prepared. (Ind. ¶ 25); and

8.    Identification of the "false and misleading information" that Rainey allegedly provided to "others working on the BP response." (Ind. ¶ 25).

The motion has merit and would be granted in full if the Court had not already determined that Count One must be dismissed.   However, because the particulars requested relate only to Count One, the motion will be denied as moot without prejudice in light of this dismissal.

G.    *Pretrial Motion No. 7*:  **Defendant David Rainey's Motion to Strike Surplusage (Rec. Doc. 49):**

In his seventh pretrial motion, the defendant moves pursuant to Rule 7(d) to strike certain surplusage from the indictment.   Specifically, Rainey moves to strike the following allegations as irrelevant and prejudicial:

1.    Paragraph 2 (second sentence):  "**The gas from the blowout ignited and quickly caused explosions that killed 11 men onboard**."

2.    Paragraph 2 (bold portion of final sentence):   "Over the next three months, **millions of barrels of** oil **gushed** into the Gulf of Mexico from the well."

3.    Paragraph 12 (bold portion of first sentence):  "In its engineering response to the Macondo oil spill, BP did not rely internally on defendant RAINEY's **contrived and inaccurate** flow-rate numbers."

4.    Paragraph 19 (bold portion of second sentence):  "The Rainey Memo, which sought to justify BP's 5,000 BOPD estimate, was false and misleading in **numerous respects, including:** . . ."

5.    Paragraph 21 (final sentence):  "**The Subcommittee was a 'Committee' for purposes of Title 18, United States Code, Section 1505.**"

6.    Paragraph 26 (bold portion of third sentence):   "As a result of defendant RAINEY's actions in withholding information and also providing false and misleading information, the BP Response made false and misleading statements to Congress, withheld and concealed information, and otherwise impeded Congress's inquiry and investigation. **For example:**..."

"For language to be struck from an indictment, it must be irrelevant, inflammatory, and prejudicial."   *United States v. Graves,* 5 F.3d 1546, 1550 (5th Cir. 1993), *cert. denied*, 511 U.S. 1081 (1994); *see also United States v. Bernegger*, 661 F.3d 232, 240 n.2 (5th Cir. 2011). Regarding the two instances of surplusage at issue in paragraph 2 of the indictment, the Court finds that they are both irrelevant to the charges against the defendant, potentially inflammatory, and present a substantial risk of unfair prejudice.   The allegations against the defendant relate

41

exclusively to communications concerning the estimation of flow rates after the oil spill had begun. He is not alleged in this case to have any responsibility for the blow out, the velocity or volume of the oil spill, or the fact that oil continued to discharge for three months. Referring in the opening words of the indictment to the eleven men killed and to the millions of gallons of oil that (experts now believe) ultimately discharged into the Gulf can only serve to inflame passions and prejudice the defendant by suggesting to the jury that he is somehow responsible for the spill, the deaths, the size of the spill, and/or the failure to contain it. Therefore, the second sentence of paragraph 2 and the words "millions of barrels of" shall be stricken. The word "gushed" shall be replaced by "discharged."

The remaining instances of surplusage concern allegations that go to Count One, which the Court has ruled must be dismissed. Given that the indictment will no doubt require redaction or reformation in light of this dismissal, the Court will defer ruling on the remaining disputed surplusage by denying the motion without prejudice insofar as it relates to language outside of paragraph 2.

## III. <u>CONCLUSION</u>:

Accordingly, for the foregoing reasons;

**IT IS ORDERED** that:

(1)     Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Lack of a Congressional Committee Inquiry or Investigation **(Rec. Doc. 39)** is hereby **DENIED IN PART**, in that it is denied insofar as it seeks to strike Count One on the basis of insufficient detail regarding authorization for the inquiry, and

**DENIED WITHOUT PREJUDICE IN PART**, in that it is denied without prejudice insofar as it seeks a determination of whether as a matter of law the May 14 letter constitutes an "inquiry or investigation" under section 1505;

(2)    Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Failure to Allege Knowledge of a Pending Congressional Investigation **(Rec. Doc. 41)** is hereby **GRANTED**;

(3)    Defendant David Rainey's Motion to Dismiss Count One of the Indictment Because Section 1505 Does Not Apply to Subcommittee Investigations **(Rec. Doc. 43)** is hereby **GRANTED**;

(4)    Defendant David Rainey's Motion to Dismiss Count One of the Indictment for Unconstitutional Vagueness **(Rec. Doc. 45)** is hereby **DENIED WITHOUT PREJUDICE AS MOOT**;

(5)    Defendant David Rainey's Motion to Exclude the August 2, 2010 Flow-Rate Estimates and the Report of the Flow Rate Technical Group **(Rec. Doc. 53)** is hereby **DENIED WITHOUT PREJUDICE AS MOOT**;

(6)    Defendant David Rainey's Motion for a Bill of Particulars **(Rec. Doc. 47)** is hereby **DENIED WITHOUT PREJUDICE AS MOOT**;

(7)    Defendant David Rainey's Motion to Strike Surplusage **(Rec. Doc. 49)** is hereby **GRANTED IN PART**, in that the second sentence of paragraph 2 and the words "millions of barrels of" in paragraph 2 shall be stricken and the word "gushed" shall be replaced by "discharged," and **DENIED WITHOUT PREJUDICE IN PART**, in that it is denied without prejudice in all other respects; and

(8)     Count One of the Indictment, charging obstruction of a congressional inquiry in

violation of 18 U.S.C. § 1505, is hereby **DISMISSED**.

New Orleans, Louisiana, this 20th day of May, 2013.

 

 

**KURT D. ENGELHARDT**
**United States District Judge**